

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-13-00312-CV

IN THE INTEREST OF C.H., D.H.,
AND J.H., MINOR CHILDREN

----------

FROM THE 235TH DISTRICT COURT OF COOKE COUNTY
TRIAL COURT NO. 09-0054

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In five issues, pro se appellant Father appeals the trial court's modification order giving appellee Mother the exclusive right to designate their children's primary residence. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Discussion

In his first issue, Father argues that Mother violated family code section 156.102 by filing her petition to modify within a year of the issuance of the trial court's first amended divorce decree without attaching an affidavit to explain the material and substantial changes that she alleged had occurred. In his overlapping second and third issues, he complains that Mother's counsel made improper jury arguments and violated the parties' agreement not to raise events occurring before January 3, 2011, and that the evidence is legally and factually insufficient to support the jury's verdict. In his fourth issue, he contends that the trial court abused its discretion by overruling his objections to evidence that was unproven, unidentifiable, and undocumented. And in his fifth issue, he asserts that his counsel was unethical for making derogatory remarks about Father during cross-examination.[2]

---

[2]A pro se litigant is held to the same standards as licensed attorneys and must comply with the rules of procedure. *See Mansfield State Bank v. Cohn*, 573 S.W.2d 181, 184–85 (Tex. 1978); *Williams v. Capitol Cnty. Mut. Fire Ins. Co.*, 594 S.W.2d 558, 559 (Tex. Civ. App.—Fort Worth 1980, no writ). In light of our obligation to liberally construe briefs, *see* Tex. R. App. P. 38.9, we will address Father's arguments to the extent that they are adequately briefed and intelligible. To the extent that Father's remaining arguments are unintelligible and inadequately briefed, they are overruled. *See* Tex. R. App. P. 38.1(i); *Gray v. Nash*, 259 S.W.3d 286, 294 (Tex. App.—Fort Worth 2008, pet. denied) (deciding that issues were waived because of inadequate briefing).

We further note that Father's brief and reply are saturated with derisive and inflammatory remarks directed at Mother, Mother's counsel, and witnesses. Such ad hominem attacks are neither persuasive nor proper by attorneys or pro se litigants. *See Lookshin v. Feldman*, 127 S.W.3d 100, 107 (Tex. App.— Houston [1st Dist.] 2003, pet. denied); *see also Gleason v. Isbell*, 145 S.W.3d

## A. Preservation

To preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a); *see also* Tex. R. Evid. 103(a)(1). If a party fails to do this, error is not preserved, and the complaint is waived. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g). The objecting party must get a ruling from the trial court, and both the objection and the ruling must be included in the appellate record. Tex. R. App. P. 33.1(a), (b). An objection is timely if made at the point evidence is offered and before the evidence is admitted. *See* Tex. R. Evid. 103; *Bushell*, 803 S.W.2d at 712. Further, the complaint on appeal must be the same as that presented in the trial court. *See Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997). An appellate court cannot reverse based on a complaint not raised in the trial court. *Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998); *see* Tex. R. App. P. 53.2(f); *Sonat Exploration Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 236 (Tex. 2008).

Furthermore, a party waives an objection to improper jury argument if he does not object immediately after the contested statement is made or preserve

354, 357–58 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (Frost, J., concurring in part and dissenting in part) (noting that pro se litigants are held to the same standards of civility that courts expect from attorneys).

the issue in a motion for new trial. *See* Tex. R. Civ. P. 324(b)(5); *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979) (stating that to prevail on an improper-jury-argument issue, appellant must show an error that was not invited or provoked; that was preserved by the proper trial predicate such as an objection, a motion to instruct, or a motion for mistrial; and that was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand from the judge); *Phillips v. Phillips*, 296 S.W.3d 656, 674 (Tex. App.—El Paso 2009, pet. denied) (holding that wife failed to preserve improper-jury-argument complaint by failing to object); *see also Cowboys Concert Hall-Arlington, Inc. v. Jones*, No. 02-12-00518-CV, 2014 WL 1713472, at *22 (Tex. App.—Fort Worth May 1, 2014, no pet. h.) (mem. op.) (stating that when appellant failed to object to improper jury argument at trial but raised issue in motion for new trial, appellant preserved error only to the extent that the argument constituted incurable error). With regard to his argument that Mother's counsel made improper jury arguments, Father did not raise the issue in his motion for new trial or object to Mother's arguments during trial. Therefore, we overrule this portion of his second issue as unpreserved.[3]

---

[3]We also overrule the portion of his second issue that pertains to an alleged agreement not to go into evidence from before January 3, 2011. This court directed the trial court clerk to prepare, certify, and file in this court a supplemental record containing the motion in limine filed on November 5, 2012. *See* Tex. R. App. P. 34.5(c)(1). The motion states, among other things, that the parties are prohibited from referencing any "events or actions occurring before the entry of the Final Decree of Divorce in this cause." However, to preserve error if a party violates a ruling granting a motion in limine, the complaining party

As to Father's fourth issue regarding the admission of evidence, although Father's argument does not clearly indicate about which specific evidence he complains, Father cites two pages of the reporter's record in which Mother's Exhibits 2 and 7 were offered during Mother's direct testimony and admitted by the trial court. With regard to Mother's Exhibit 2, Father objected at trial that the document was "not her complete handwriting, and this would be self-serving," but he makes no such argument (or, indeed, any argument) on appeal to show this court how the trial court abused its discretion by overruling the objection. And although Father now argues that the photographs in Mother's Exhibit 7 are unidentifiable and that Mother did not prove with regard to the photographs that something happened to the children while under his care, he did not raise these arguments in the trial court. Therefore, to the extent that Father has adequately briefed this issue, he has failed to preserve either argument, and we overrule his fourth issue. *See Wilson*, 971 S.W.2d at 450; *Garcia*, 955 S.W.2d at 272.

In his fifth issue, Father asks whether his attorney was "unethical in making derogatory statements towards [Father] in front of the jury while being cross examined by [Mother's counsel]?" Based on the record citation provided by

must timely object to the violation. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g). Father does not provide a single citation to the record to support his claim that Mother's counsel violated the motion in limine during "the questioning and testimony of [Father]." *See* Tex. R. App. P. 38.1(i); *Gray*, 259 S.W.3d at 294. Therefore, we overrule this portion of Father's second issue as inadequately briefed.

Father, his complaint stems from the following dialogue that arose when his counsel testified about attorney's fees:

> Q. All right. Did you set up a payment plan with [Father]?
>
> . . . .
>
> A. No, ma'am. I wished I had have.
>
> Q. Okay.
>
> A. But I did receive—he did give us 7,500 down. And that's all that I have received.
>
> . . . .
>
> Q. Okay. But didn't he just testify that he was able to buy a new vehicle in April of this year?
>
> . . . .
>
> A. *I was not very pleased with that either.* [Emphasis added.]

Father cites no legal authority to support his argument, which is comprised of a single sentence: "Yes, [Father's counsel] made a derogatory statement towards his client after being led by [Mother's counsel]." *See Washington v. Bank of N.Y.*, 362 S.W.3d 853, 854–55 (Tex. App.—Dallas 2012, no pet.) (holding that appellant's complaint that his attorney's legal representation was unprofessional was waived for inadequate briefing when he provided no argument, analysis, or authority in support). Accordingly, we overrule Father's fifth issue as inadequately briefed. *See* Tex. R. App. P. 38.1(i); *Gray*, 259 S.W.3d at 294.

6

**B. Modification**

With regard to Father's first issue, in his original answer and motion to dismiss, Father argued that the trial court should deny Mother's petition to modify because it was filed within one year of the first amended divorce decree and did not contain an affidavit to support her allegations in contravention of family code section 156.102. *See* Tex. Fam. Code Ann. § 156.102(a) (West 2014) (stating that if a suit to modify is filed "not later than one year after the earlier of the date of the rendition of the order . . ., the person filing the suit shall execute and attach an affidavit as provided by Subsection (b)"). However, "'[a] judgment is in fact rendered whenever the trial judge officially announces his decision in open court . . . in his official capacity for his official guidance whether orally or by written memorandum the sentence of law pronounced by him in any cause.'" *Samples Exterminators v. Samples*, 640 S.W.2d 873, 875 (Tex. 1982) (quoting *Comet Aluminum Co. v. Dibrell*, 450 S.W.2d 56, 59 (Tex. 1970)).

In the January 3, 2011 first amended divorce decree, the trial court appointed both parents as joint managing conservators and granted Father the exclusive right to designate the children's primary residence. The face of the judgment states, "*This divorce was judicially pronounced, granted and rendered in Court at Gainesville, Cooke County, Texas on the 27th day of July, 2010 and further notes on the court's docket sheet on the same date but signed on this*: 3 day of January, 2011." On August 9, 2011, over a year after rendition in open

7

court, Mother filed her petition to modify. Because Mother filed her petition to modify over a year after the date of rendition reflected in the trial court's written decree, Mother did not violate section 156.102(a). We overrule Father's first issue.

## C. Factual Sufficiency

In the remainder of his second and third issues, Father challenges the legal and factual sufficiency of the evidence to support the jury's verdict. Father preserved his factual sufficiency challenge by raising the issue in his motion for new trial. *See* Tex. R. Civ. P. 324(b)(2). However, because Father did not raise legal sufficiency in his motion, he has not preserved the issue for review. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220–21 (Tex. 1992).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *See Pool*, 715 S.W.2d at 637; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). When conducting a factual-sufficiency review, a court of appeals must not merely substitute its judgment for that of the trier of fact. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The trier of fact is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Id.*

8

The burden of proof in conservatorship cases is by a preponderance of the evidence. Tex. Fam. Code Ann. § 105.005 (West 2014); *see In re W.M.*, 172 S.W.3d 718, 724 (Tex. App.—Fort Worth 2005, no pet.) ("The burden of proof in conservatorship cases, as opposed to termination cases, is a preponderance of the evidence.").

### 1. Material and Substantial Change

Mother alleged in her petition that the circumstances of the children, a conservator, or other party affected by the order to be modified had materially and substantially changed since the date of rendition of the order to be modified. She asked the trial court to appoint her as the conservator with the exclusive rights to determine the children's residence, to "make psychological and/or psychiatric decisions regarding the children," and to make educational decisions regarding the children after consultation with Father. Mother further asked that Father be ordered to pay child support. *See* Tex. Fam. Code Ann. § 156.101(a)(1)(A) (West 2014) (stating that an order affecting the parent-child relationship can be modified by showing both that the modification is in the children's best interest and that the children's circumstances have materially and substantially changed since rendition of the existing order). The jury found that the material allegations in Mother's petition to modify were true and that modification was in the children's best interest.

In his counter-petition to modify, Father stated that "[t]he circumstances of the children or a person affected by the order have materially and substantially

9

changed since the date of the rendition of the order to be modified," which was a judicial admission barring him from challenging the sufficiency of the evidence to support that finding. *See In re A.E.A.*, 406 S.W.3d 404, 409–410 (Tex. App.—Fort Worth 2013, no pet.) (holding that father's allegation of changed circumstances in his motion to modify constituted a judicial admission of that fact and established that element of mother's modification claim); *see also In re L.C.L.*, 396 S.W.3d 712, 718 (Tex. App.—Dallas 2013, no pet.) ("One party's allegation of changed circumstances of the parties constitutes a judicial admission of the common element of changed circumstances of the parties in the other party's similar pleading."). Accordingly, we overrule this portion of Father's sufficiency challenge and will review the evidence to determine whether it is factually sufficient to support the jury's finding that the requested modification was in the children's best interest.

## 2. Best Interest of the Children

A court's primary consideration in determining the issue of conservatorship and possession must always be the best interest of the child, which courts may use a nonexhaustive list of factors to determine. Tex. Fam. Code Ann. § 153.002 (West 2014); *In re J.P.M.*, No. 02-11-00441-CV, 2012 WL 2428495, at *2 (Tex. App.—Fort Worth June 28, 2012, no pet.) (mem. op.). Those factors include:

(A) the desires of the child;

(B) the emotional and physical needs of the child now and in the future;

10

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individual seeking custody;

(E) the programs available to assist the individual to promote the best interest of the child;

(F) the plans for the child by the individual or by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

### a. The Emotional and Physical Needs of the Children

The children at issue here are C.H., age 8; D.H., age 6; and J.H., age 5. Father testified that he had worked as a firefighter for the Dallas Fire Department for the last fifteen years; that his schedule required him to work twenty-four hours on, forty-eight hours off; and that he left for work at 5:00 a.m. because his fire station is sixty-four miles from his residence. Father said that he helped the children with their schoolwork, enrolled them in sports, accompanied them to games and practices, coached D.H.'s and J.H.'s soccer teams, participated with them in Cub Scouts, and took them on camping trips. According to Father, it was in the children's best interest to remain with him because they were doing well in school; they enjoyed having their paternal grandmother next door; they had established friendships in his community; they were strong, healthy, and active;

11

and they loved living with him at the "man cave in the middle of [twenty-eight] acres in the country."

Mother testified that she was a paramedic in Farmers Branch and would complete her bachelor's degree in biology in the fall of 2013. Mother's sixteen-month-old baby, J.B., was born after the divorce and lived with her at her residence. She stated that the children loved J.B. and that they played together and gave him hugs constantly.[4]

Mother further testified that Father could be mean, aggressive, and abusive behind closed doors. She stated that since the divorce, the children have become increasingly violent and have suffered too many injuries and bruises from fighting because Father would not stop them when they become too aggressive. Additionally, Mother testified that her residence was located in a neighborhood filled with kids of similar age to the children, whereas Father's residence was in an unpopulated area and the only time the children could play with other kids while there was when the babysitter's children were present.

Mother also testified that she was concerned about the psychological well-being of the children since the divorce, noting that C.H. had become increasingly

---

[4]Dr. Jeffrey Siegel, a forensic psychologist appointed by the court to conduct a forensic childhood custody evaluation, testified to the positive benefit of having children bond with their younger siblings, stating that sibling-based connections are some of the strongest humans can have. He further emphasized that "the attachment and the bonding is certainly the most important element for the children when they're young, as well as when they continue on through life."

depressed and anxious and that "he started vomiting up to eight times a day."[5] Dr. Nancy Davidson, the children's psychologist, testified that she had diagnosed C.H. with "anxiety not otherwise specified," a combination of depression and anxiety. She also diagnosed both D.H. and J.H. as having "adjustment reaction of childhood," which she explained is an adjustment reaction to stressors that can be sufficiently debilitating to one or more areas of their development or performance.

Furthermore, the children's maternal grandmother testified that when Mother picked up the children from Father, they were very rowdy, calling each other names and spitting at each other, and that it usually took between two and four days for Mother to get them under control. Tyra Taylor, a friend of Mother's, testified that she had observed numerous occasions during which the children hit, kicked, and bit each other when they first returned from staying with Father. Taylor also stated that Mother was very patient when she disciplined the children and that Mother's methods consisted of separating the children and placing them in time-out.

MaryAnn Kildebeck, a licensed clinical social worker and Mother's therapist, testified that Mother's primary concern was the children's well-being. She further opined that she would have no concerns for the children's safety or

---

[5]Mother testified that Father became upset and began yelling at her during one of C.H.'s soccer games and called the police because she wanted to take the boys for her visitation period. According to Mother, "[C.H.] got upset because he thought the cops would take [her] away, and he vomited."

13

welfare if Mother was given the right to designate the children's primary residence.

## b. The Emotional and Physical Danger to the Children

Mother expressed concern regarding the children's safety at Father's residence because the yard was covered in trash and animal bones,[6] Father allowed the children to walk through Father's chicken coops with bare feet, and the children would come home with wet clothes that smelled like urine after playing in dog kennels that belong to Father's mother, who bred dogs on her property. The children's maternal grandmother testified that Father's yard surrounding his residence is hardly ever mowed, that she had observed piles of half-deteriorated trash and garbage in the yard, and that Father's belongings for the last thirty years were stacked in piles around the house.

Mother stated that on one occasion, D.H. came back from Father's house with large scratches on his leg after he was dragged behind a four-wheeler. Father explained that he owned an electric dune buggy that ran up to nine miles per hour and that J.H.—who was five at the time of trial—was driving it when D.H. grabbed onto the back and scraped his leg. On another occasion, Mother found diarrhea running down J.H.'s leg when she picked him up from Father's residence.

---

[6]Father stated that there are cows located around his property and that the dogs will occasionally bring cow or animal bones into the yard from the surrounding area.

In addition to her concerns for the children's safety on Father's property, Mother testified that due to its remote location, the children were forced to make an hour-long bus ride to school each morning. Mother testified about an incident in which the children fell asleep on the bus and had to be driven back to school from the bus barn when the driver realized they were still onboard.

### c. Other Factors

Mother testified that Cassandra Reed, whom Father used as a babysitter, allowed the children to ride in the luggage area of her hatchback vehicle without securing them in car seats, which they were legally required to use. Dr. Davidson also testified that two of the children told her that Reed was allowing them to ride without using seat belts. Additionally, Mother stated that although C.H. was legally required to ride in a booster seat due to his age and size, Father allowed him to travel without one because he did not feel that C.H. needed to be in a booster seat.

Dr. Davidson testified that C.H. was initially open and forthcoming during their sessions but that he had recently said that he was afraid to say anything else to her because he did not want it getting back to Father, who had told him that Dr. Davidson shared everything they discussed during their meetings. Dr. Davidson also testified that she had received emails from Father asking her to

15

stop treating the children and requesting that she discourage Mother from scheduling appointments in the future.[7]

As Mother expressed her concern regarding the children's long commute to school, she noted that her residence was only a three-minute walk to the nearest elementary school, which was located in the nationally-recognized Allen ISD.[8]  Mother testified that she intended to promote the children's academic growth ahead of their athletic growth and that she wanted the children to live with her so that they would be able to attend school in Allen ISD.

### d.  Analysis

Here, the jury weighed the evidence and assessed the credibility of Father, Mother, and the witnesses called during trial.  *See Golden Eagle Archery*, 116 S.W.3d at 761.  The jury could have found from this record that Father's residence was a dangerous environment for the children and that Father had shown a lack of concern for their physical safety and well-being.  *In re A.G.C.*, No. 02-12-00340-CV, 2014 WL 24226, at *3 (Tex. App.—Fort Worth Jan. 2, 2014, no pet. h.) (mem. op.) (holding that modification was in best interest of

---

[7]Father admitted that he had told Dr. Davidson that he did not believe in her tactics, stating that C.H. "had twice cried over a visit that he had made to her office."  He also testified that he did not feel like the children needed further testing because he did not think that the children had any emotional issues.

[8]The children's maternal grandfather, who teaches at Allen High School, testified that Allen ISD has been rated as one of the top districts in the state, that the children would be better off attending school there, and that people have moved to Allen from surrounding districts to take advantage of the special education and extra services the school district provides.

child when evidence showed that child's current environment was unsafe and that child was not properly supervised while in appellant's care). Further, the record reveals and the jury could have found that the children had become increasingly aggressive and violent since the divorce and that under Father's care, they were very rowdy and lacked behavioral boundaries. *See Mauldin v. Clements*, 428 S.W.3d 247, 270 (Tex App. Houston [1st Dist.] 2014, no pet. h.) (holding that modification was in the children's best interest where evidence showed that since children began living with grandparents, they were more emotionally stable, their relationships with each other had improved, and their performance and behavior at school had drastically improved). The jury could have also found that Mother's residence and neighborhood were more appropriate for young children and presented better stability and educational opportunities. *See Dennis v. Smith*, 962 S.W.2d 67, 70–71 (Tex. App.—Houston [1st Dist.] 1997, pet. denied) (holding that modification was in best interest of child because, among other things, residence was located thirty seconds from local school and in a neighborhood filled with children).

Accordingly, we conclude that the evidence was factually sufficient to support the jury's finding that it was in the children's best interest to modify the conservatorship in Mother's favor and provide her with the exclusive right to designate the children's primary residence. *See Martinez*, 977 S.W.2d at 334; *Pool*, 715 S.W.2d at 635. Therefore, we overrule the remainder of Father's second and third issues.

## III. Conclusion

Having overruled all of Father's issues for which we have been able to ascertain his arguments on the merits and having overruled the remainder as inadequately briefed, we affirm the trial court's judgment.

PER CURIAM

PANEL:  MCCOY, J.; LIVINGSTON, C.J.; and GABRIEL, J.

DELIVERED:  August 7, 2014

18